2021 PA Super 75

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                             :             PENNSYLVANIA
                             :
           v.                   :
                             :
                             :
MELVIN HOWARD              :
                             :
           Appellant         :     No. 2821 EDA 2019

Appeal from the PCRA Order Entered September 11, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0304271-1988

BEFORE:    BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY BENDER, P.J.E.:                **FILED APRIL 20, 2021**

Appellant, Melvin Howard, appeals from the order dismissing his

untimely petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42

Pa.C.S. §§ 9541-9546. After careful review, we affirm.

The facts underlying Appellant's conviction are not germane to this

appeal. The PCRA court described the relevant procedural history of this case

as follows:

> On September 14, 1989, a jury found [Appellant] guilty of first[-
> ]degree murder and related charges in connection with the
> stabbing death of Clarence Woodlock. During the penalty phase,
> the jury returned a verdict of death for the murder. [Appellant]
> appealed this judgment of sentence; his sentence was affirmed by
> the Pennsylvania Supreme Court on August 8, 1994.
> ***Commonwealth v. Howard***, 645 A.2d 1300 (Pa. 1994).
>
> On May 11, 1995, [Appellant] filed his first PCRA petition, raising
> several claims of ineffective assistance of counsel. This petition

_____

[*] Retired Senior Judge assigned to the Superior Court.

was dismissed by the PCRA court and subsequently affirmed by the Sup[reme] Court on October 1, 1998. ***Commonwealth v. Howard***, 719 A.2d 233 (Pa. 1998). On July 17, 1999, he filed his second PCRA petition, claiming that the prosecutor's use of peremptory strikes during jury selection was racially discriminatory in violation of ***Batson v. Kentucky***, 476 U.S. 79 (1986). This petition was dismissed as untimely on February 24, 2000. The Supreme Court affirmed the dismissal on January 22, 2002. ***Commonwealth v. Howard***, 788 A.2d 351 (Pa. 2002).

On September 16, 2011, by agreement between the parties, the Honorable Carolyn Temin vacated [Appellant]'s death sentence and resentenced him to life imprisonment without the possibility of parole.[1]

On August 23, 2018, [Appellant] filed his third PCRA petition, the matter before this [c]ourt. [Appellant] is represented by Ayanna Williams, Esquire[,] of the Federal Community Defender Office for the Eastern District of Pennsylvania. In his petition, [Appellant] alleges a ***Batson*** violation based upon the findings of the [2018 Joint State Government Commission Report on Capital Punishment ("JSGC Report")]. He claims that the commission's findings on jury selection in capital cases is a newly-discovered

_____

[1] Appellant adds that:

While the second PCRA petition was pending, [Appellant] filed a Petition for a Writ of *Habeas Corpus* in the United States District Court for the Eastern District of Pennsylvania. The District Court held the federal proceedings in suspense pending the exhaustion of [Appellant]'s claim that, in light of ***Atkins v. Virginia***, 536 U.S. 304 (2001) [(prohibiting the execution of inmates with severe mental disabilities)], his death sentence was unconstitutional. On September 16, 2011, the Honorable Carol Temin of the Pennsylvania Court of Common Pleas, by agreement of the parties, vacated Appellant's death sentence and resentenced [him] to life in prison without the possibility of parole.

Appellant's Brief at 3. Our review of the January 28, 2011 hearing addressing Appellant's ***Atkins*** claim, and from the September 15, 2011 resentencing hearing, indicates that Appellant either met the criteria for relief under ***Atkins*** due to severe mental impairment, or that the Commonwealth declined to oppose that claim after conducting its own investigation. ***See*** N.T., 1/28/11, at 1-10.

fact that allows him to overcome the time bar. On May 3, 2019, the Commonwealth filed its Motion to Dismiss. On May 21, 2019, [Appellant] replied to the Commonwealth's Motion to Dismiss. On August 6, 2019, this [c]ourt sent [Appellant] a Notice of Intent [to Dismiss the Petition] [p]ursuant to [Pa.R.Crim.P.] 907. On August 26, 2019, [Appellant] replied to the [Rule] 907 Notice. On September 11, 2019, this [c]ourt dismissed [Appellant]'s petition as untimely and without merit. On October 2, 2019, [Appellant] appealed this dismissal to the Superior Court.

PCRA Court Opinion ("PCO"), 6/30/20, at 2-3. The PCRA court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant did not file one. The court issued its Rule 1925(a) opinion on June 30, 2020.

Appellant now presents the following questions for our review:

I. Did the court below err in concluding that the claims raised in [Appellant]'s successor PCRA petition were untimely under 42 Pa.C.S. § 9545(b), where the newly[-]discovered evidence included admissions from the [JSGC Report] regarding racial disparities in jury selection?

II. Did the court below err in denying a new trial where [Appellant] pled and proved that racial discrimination during jury selection violated his rights to a jury of his peers and to be free from cruel punishments under Article I, Sections 6 and 13 of the Pennsylvania Constitution?

Appellant's Brief at 2.

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

- 3 -

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (internal citations omitted).

We must begin by addressing the timeliness of Appellant's petition, because the PCRA time limitations implicate our jurisdiction and may not be altered or disregarded in order to address the merits of a petition. *See Commonwealth v. Bennett*, 930 A.2d 1264, 1267 (Pa. 2007). Under the PCRA, any petition for post-conviction relief, including a second or subsequent one, must be filed within one year of the date the judgment of sentence becomes final, unless one of the following exceptions set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii) applies:

> **(b) Time for filing petition.--**
>
> (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
>> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>>
>> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>>
>> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). Additionally, Section 9545(b)(2) requires that any petition attempting to invoke one of these exceptions "be filed within one year of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

Appellant concedes that his petition is untimely. In his first issue, he asserts that his petition meets the timeliness exception set forth in Section 9545(b)(1)(ii), which concerns newly-discovered facts. Appellant describes the new facts as follows:

> Prompted by troubling reports from the American Bar Association … and the Pennsylvania Supreme Court's Committee on Racial and Gender Bias in the Justice System…, the Pennsylvania Senate directed the JSGC "to conduct a study on capital punishment in this Commonwealth," covering eighteen specific topics and problems. Pa. Sen. Res. 6 at 2-6 (Dec. 6, 2011). On June 25, 2018, the JSGC issued its report entitled "Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee."[2]
>
> The JSGC Report revealed that racial disparities in jury selection pervasively and persistently infected the Commonwealth's capital prosecution system and that Pennsylvania should adopt structural and procedural reforms to address such defects. [Appellant]'s petition for PCRA and habeas relief, which raised constitutional violations arising from discriminatory jury selection practices in capital prosecutions, was filed within sixty days of the publication of the JSGC Report.

Appellant's Brief at 4 (footnote omitted). He further argues that:

> The discriminatory exercise of peremptory challenges against black prospective jurors in [Appellant]'s case was consistent with the systematic racial discrimination in jury selection identified in the JSGC Report. The prosecutor in [Appellant]'s case struck 1.5

---

[2] As of the date of the filing of this decision, the JSGC Report can be found at http://jsg.legis.state.pa.us/publications.cfm?JSPU_PUBLN_ID=472.

times as many black prospective jurors as white, which is statistically significant. The intentional and pervasive practice of race discrimination infringed on [Appellant]'s rights to be tried by a jury that was representative of the community and subjected him to a cruel punishment, in violation of Pennsylvania's Constitution.

*Id.* at 42.

Thus, the crux of Appellant's argument is that the JSGC Report provides newly-discovered evidence of racial discrimination that occurred during his jury selection process, providing a factual basis to support several constitutional claims that would potentially entitle him to a new trial. The PCRA court determined that the JSGC Report did not satisfy the requirements of Section 9545(b)(1)(ii), concluding generally that:

[A] review of the JSGC [R]eport shows that the underlying data used to perform the statistical analysis was not new and was part of the public domain before the report's release. Since the underlying data was known and available to the public for years prior to the report's release, and [Appellant] has been represented by counsel so the *pro se* defendant exception does not apply, this report cannot be considered a newly-discovered fact for purposes of overcoming the time bar.

PCO at 8.

As this Court has previously stated:

The timeliness exception set forth in Section 9545(b)(1)(ii) requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence. ***Commonwealth v. Bennett***, 930 A.2d 1264, 1271 (Pa. 2007). Due diligence demands that the petitioner take reasonable steps to protect his own interests. ***Commonwealth v. Carr***, 768 A.2d 1164, 1168 (Pa. Super. 2001). A petitioner must explain why he could not have learned the new fact(s) earlier with the exercise of due diligence. ***Commonwealth v. Breakiron***, 781 A.2d 94, 98 (Pa. 2001); ***Commonwealth v. Monaco***, 996 A.2d 1076, 1080 (Pa.

Super. 2010)…. This rule is strictly enforced. ***Id.*** Additionally, the focus of this exception "is on the newly[-]discovered facts, not on a newly[-]discovered or newly[-]willing source for previously known facts." ***Commonwealth v. Marshall***, 947 A.2d 714, 720 (Pa. 2008)….

The timeliness exception set forth at Section 9545(b)(1)(ii) has often mistakenly been referred to as the "after-discovered evidence" exception. ***Bennett***, ***supra*** at … 1270. "This shorthand reference was a misnomer, since the plain language of subsection (b)(1)(ii) does not require the petitioner to allege and prove a claim of 'after-discovered evidence.'" ***Id.*** Rather, as an initial jurisdictional threshold, Section 9545(b)(1)(ii) requires a petitioner to allege and prove that there were facts unknown to him and that he exercised due diligence in discovering those facts. ***See*** 42 Pa.C.S. § 9545(b)(1)(ii); ***Bennett***, ***supra***. Once jurisdiction is established, a PCRA petitioner can present a substantive after-discovered-evidence claim. ***See*** 42 Pa.C.S. § 9543(a)(2)(vi) (explaining that to be eligible for relief under PCRA, petitioner must plead and prove by preponderance of evidence that conviction or sentence resulted from, *inter alia*, unavailability at time of trial of exculpatory evidence that has subsequently become available and would have changed outcome of trial if it had been introduced). In other words[:]

> [S]ubsection (b)(1)(ii) has two components, which must be alleged and proved. Namely, the petitioner must establish that: 1) the ***facts*** upon which the claim was predicated were ***unknown*** and 2) could not have been ascertained by the exercise of ***due diligence***. If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under this subsection.

***Bennett***, … 930 A.2d at 1272 (internal citations omitted) (emphasis in original). Thus, the "new facts" exception at Section 9545(b)(1)(ii) does not require any merits analysis of an underlying after-discovered-evidence claim. ***Id.*** at … 1271.

***Commonwealth v. Brown***, 111 A.3d 171, 176–77 (Pa. Super. 2015) (some citations reformatted, footnote omitted).

Appellant first asserts that the PCRA court erred by determining that the substance of the facts contained in the JSGC Report was not previously

unknown, asserting that "a governmental agency's public admission of widespread, systemic error in criminal prosecutions, like the JSGC Report …, itself represents a new fact triggering the … time period to file a successive petition" under Section 9545(b)(2), relying on our Supreme Court's reasoning in ***Commonwealth v. Chmiel***, 173 A.3d 617 (Pa. 2017).  Appellant's Brief at 13.  He further argues:

> To the extent that the JSGC Report relied on pre-existing data and research, the report's authoritative analysis of both old and new data—and the Governor's express invocation of the these recommendations to establish a moratorium on executions[10]—make the report "new evidence . . . of a higher grade or character than what was previous [available] on a material issue." ***Commonwealth v. Small***, 189 A.3d 961, 975-76 (Pa. 2018) (holding that [a] witness' testimony recounting a confession by an alternate suspect was not "merely" cumulative of other statements because of its details and the caliber of the witness); ***Commonwealth v. McCracken***, 659 A.2d 541, 545 (Pa. 1995) (upholding grant of new trial under the after-discovered-evidence standard where it was belatedly learned that the defendant may have been convicted on the basis of false testimony though the defendant previously had alleged that the witness' testimony was unreliable).

> [10] On February 13, 2015, Governor Tom Wolf issued the first in a series of reprieves postponing executions of death-sentenced Pennsylvania prisoners until the JSGC Report was issued and "any recommendations contained therein [were] satisfactorily addressed."  ***Commonwealth v. Williams***, 129 A.3d 1199, 1202 (Pa. 2015).

***Id.*** at 15.

In ***Chmiel***, the appellant filed an untimely PCRA petition, "asserting that his conviction and death sentence rested upon unreliable hair comparison evidence in violation of the Sixth, Eighth, and Fourteenth Amendments to the

United States Constitution…." *Chmiel*, 173 A.3d at 621. Chmiel argued that an FBI press release (and a related Washington Post article) regarding historically flawed hair analysis constituted new facts that satisfied the timeliness exception of Section 9545(b)(1)(ii). The press release was

> entitled "FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review." In the press release, the FBI publicly disclosed the initial findings of an ongoing investigation undertaken jointly by the Department of Justice …, the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers …. The investigation scrutinized the testimony of FBI analysts concerning microscopic hair comparison analysis prior to 2000, the point at which mitochondrial DNA testing became routine in the FBI. The review was prompted by exonerations of three men who had been convicted, in part, based upon the scientifically flawed testimony of three FBI hair examiners. The review encompassed cases in which FBI microscopic hair comparison was used to link a defendant to a crime in both the federal and state systems. The FBI concluded that its examiners' testimony in at least 90% of cases contained erroneous statements. The FBI's findings "confirm[ed] that the FBI microscopic hair analysts committed widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case...."

*Id.* (citations omitted). Importantly, the "revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials." *Id.* at 625. In denying Chmiel's petition, the PCRA court had "narrowly construed the newly[-]discovered[-]facts exception in holding that the underlying information contained in the FBI press release was simply confirmation of information that was already available in the public domain," relying on our Supreme Court's decision in *Commonwealth v. Edmiston*, 65

A.3d 339 (Pa. 2013). *Id.* at 625-26. The ***Chmiel*** Court summarized its prior holding in ***Edmiston*** as follows:

> ***Edmiston*** involved a PCRA petition filed by a capital defendant who, like ***Chmiel***, was convicted following the introduction of hair comparison analysis testimony at trial. On February 18, 2009, the National Academy of Sciences published a report entitled "Strengthening Forensic Science in the United States: A Path Forward" (hereinafter, "the NAS Report"). The NAS Report was a review of prior studies and articles, as well as the National Academy of Sciences' conclusion that "there was no scientific support for the use of microscopic hair analysis for individualization that is not accompanied by mitochondrial DNA analysis." ***Edmiston***, 65 A.3d at 351.
>
> On April 17, 2009, Edmiston raised a facially untimely claim for post-conviction relief premised upon the NAS Report. ***Edmiston***, 65 A.3d at 344. Edmiston relied upon the NAS Report in attempting to establish the newly[-]discovered[-]fact exception to the one-year time bar. ***Edmiston***, 65 A.3d at 350–51; 42 Pa.C.S. § 9545(b)(1)(ii). Edmiston asserted that the NAS Report was a newly[-]discovered fact that supported his claim of actual innocence, because it demonstrated that the Commonwealth's hair analysis evidence was "false, misleading, and unreliable." ***Edmiston***, 65 A.3d at 351.
>
> On appeal from the PCRA court's dismissal of Edmiston's petition as untimely, this Court addressed the applicability of the newly[-]discovered[-]facts exception to the PCRA's jurisdictional time restrictions. ***See*** 42 Pa.C.S. § 9545(b)(1)(ii). We observed that, "to constitute facts which were unknown to a petitioner and could not have been ascertained by the exercise of due diligence, the information must not be of public record and must not be facts that were previously known but are now presented through a newly discovered source." ***Edmiston***, 65 A.3d at 352.[6] Evaluating Edmiston's reliance upon the NAS Report as a newly discovered fact, this Court explained that "the 'fact' [that Edmiston] relies upon as newly discovered is not the publication of the NAS Report, but the analysis of the scientific principles supporting hair comparison analysis." ***Id.*** This Court held that the "fact" contained within the NAS Report was not new, as questions about the reliability of hair comparison analysis had existed in various sources prior to publication of the NAS Report:

"Specifically, the NAS Report refers to various studies and reports published in the public domain as early as 1974 and as recently as 2007.  As such, the information relied upon by [Edmiston] in the Report constitutes facts that were in the public domain and could have been discovered by [Edmiston] through the exercise of due diligence prior to the filing of his ... Petition." ***Edmiston***, 65 A.3d at 352.  This analysis led the Court to conclude that the NAS Report failed to satisfy the timeliness exception for newly discovered facts.

> [6] We recently held that "the presumption that information which is of public record cannot be deemed 'unknown' for purposes of subsection 9545(b)(1)(ii) does not apply to *pro se* prisoner petitioners." ***Commonwealth v. Burton***, … 158 A.3d 618, 637-38 ([Pa.] 2017).

***Chmiel***, 173 A.3d [at] 623–24….

The ***Chmiel*** Court ultimately rejected the PCRA court's reliance on

***Edmiston***, distinguishing Chmiel's claim as follows:

> There are ***two newly discovered facts*** upon which Chmiel's underlying claim is predicated, both of which were made public for the first time in the Washington Post article and the FBI press release.  First, ***the FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases***. The FBI's revelation reverberated throughout the country, marking a "watershed in one of the country's largest forensic scandals," precisely because it constituted a public admission by the government agency that had propounded the widespread use of such scientifically flawed testimony. The revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials. The Washington Post article acknowledged the novelty of the FBI's disclosures: "While unnamed federal officials previously acknowledged widespread problems, the FBI until now has withheld comment because findings might not be representative." Second, the FBI press release included the revelation that ***the FBI had trained many state and local analysts to***

> ***provide the same scientifically flawed opinions in state criminal trials.***
>
> With these newly discovered, material facts, the FBI press release indicates that Surma's[3] trial testimony may have exceeded the limits of science and overstated to the jury the significance of the microscopic hair analysis. Surma used microscopic hair analysis in an attempt to link Chmiel to the crime. The FBI now has publicly repudiated the use of microscopic hair analysis to "link a criminal defendant to a crime." The FBI's repudiation and disclosure about its role in training state and local forensic examiners satisfies Section 9545(b)(1)(ii), and entitles Chmiel to a merits determination of his underlying claim.

***Chmiel***, 173 A.3d at 625–26 (emphasis added, citations to the record omitted).

In the instant case, the PCRA court distinguished the JSGC Report from the evidence presented in ***Chmiel***, reasoning:

> In the case at bar, [Appellant] makes a similar argument to … Chmiel, arguing that the information in the JSGC[] [R]eport could not have been discovered until the report's release on June 25, 2018. He claims that he "relies in significant part on the recommendations and conclusions of the report" which could not have been discovered before the report was released, however he does not specify what those conclusions or recommendations were. Most detrimental to [his] newly-discovered[-]fact argument is that the ***Chmiel*** [C]ourt did not overturn the standard in Pennsylvania that statistical analysis of the criminal justice system does not meet the newly-discovered[-]fact exception to the time-bar. Rather, it found that … Chmiel was relying on facts presented for the first time in a press release, not any underlying statistical analysis. Without specifying which conclusions and recommendations are new and analogous in nature to the new facts in ***Chmiel***, the relief granted in ***Chmiel*** is inapplicable to [Appellant]. Indeed, a review of the JSGC [R]eport shows that the underlying data used to perform the statistical analysis was not new and was part of the public domain before the report's

---

[3] Surma testified at Chmiel's trial as the Commonwealth's hair analysis expert.

release. Since the underlying data was known and available to the public for years prior to the report's release, and [] has been represented by counsel so the *pro se* defendant exception does not apply, this report cannot be considered a newly-discovered fact for purposes of overcoming the time bar.

Furthermore, the JSGC [R]eport is substantially different than the press release in **Chmiel**. The press release in **Chmiel** contained an admission of improper scientific analysis from the prosecutorial agency that had been convicting defendants using this analysis. The JSGC [R]eport, on the other hand, was released by an independent and bipartisan governmental agency and does not include any language that could be considered an admission of error by prosecutors or the judiciary with respect to the imposition of the death penalty. [Appellant] claims that the report contains "the admission of widespread, systemic error in criminal prosecutions," however, this [c]ourt's review of the text of the report did not uncover such an admission. While the report does note areas of concern and suggests recommendations, it does not go so far as to admit widespread, systemic error in criminal prosecutions. It should also be noted that the task force members behind the report are Pennsylvania state senators, unlike the press release in **Chmiel** which was released by the FBI, a federal law enforcement agency. Since the holding in **Chmiel** is inapplicable, this [c]ourt properly dismissed [Appellant]'s petition as untimely[,] since the JSGC [R]eport was not a newly-discovered fact capable of overcoming the PCRA's time bar.

PCO at 8-9.

We agree with the PCRA court. The JSGC Report is more analogous to the NAS Report in **Edmiston**, and is distinguishable from the public admissions at issue in **Chmiel**. Although Appellant contends that he is not relying on the underlying data of the JSGC Report, but instead on the report's conclusions based on the underlying data, we agree with the PCRA court that those conclusions do not constitute evidence "of a higher grade or character than what was previous[ly available] on a material issue." **Small**, 189 A.3d at 975-76. We further agree with the Commonwealth that:

[Appellant] here asserts that "the new fact is not that [he] was convicted by a biased jury," but rather "the JSGC's admission that juries selected in capital cases like [Appellant]'s were shaped by a jury selection process that eliminated certain social and demographic groups." []Appellant's [B]rief at 11[]. However, this so-called "admission" is not a fact that has any relation or direct nexus to [Appellant]'s own case.[3] The report does not allege that the prosecutor in [Appellant]'s case acted with discriminatory intent.

> [3] It is important to note that nowhere in the JSGC [R]eport is there an "admission" of wrongdoing on the part of the Commonwealth. The report merely cites other reports suggesting hypothetically that "attorneys, who know statistical research on demographics and attitudes, **might** rely on that knowledge to exclude potential jurors … to increase the possibility of creating a jury that will decide in their favor." JSGC Report at 11 (emphasis added).

Commonwealth's Brief at 10-11.

In **Chmiel**, by contrast, the FBI admitted that its hair analysis was flawed in the vast majority of cases, and that its own experts, and the experts trained by the FBI, had given fatally flawed scientific opinion testimony concerning the strength of that evidence in virtually every case in which hair analysis was presented. That provided a distinct and concrete link to the flawed evidence and related scientific opinion testimony presented at Chmiel's trial, where the Commonwealth had presented a witness, Surma, who had made the problematic scientific claims.

There is no analogous admission in the instant case regarding the prosecutor's ostensible discriminatory exclusion of jurors at Appellant's capital trial. Rather, akin to **Edmiston** with respect to the NAS Report, a systemic problem has been identified in the JSGC Report regarding racial and other

problematic demographic disparities in jury selection. However, there has been no revelation in the JSGC Report of a specific error in Appellant's case, an admission of such an error by the prosecutor or the District Attorney's office, nor an admission of a systemic error that necessarily impacted Appellant's case. Thus, Appellant fails to convince us that his claim is on par with the revelations that triggered the timeliness exception of Section 9545(b)(1)(ii) in *Chmiel*. Accordingly, we conclude that the JSGC Report does not constitute a "newly-discovered fact" that was previously unknown to Appellant when he filed the PCRA petition under review.

Consequently, we need not address whether Appellant acted with due diligence in acquiring that information, because he fails to satisfy the first prong of the test for newly-discovered facts. Appellant concedes that he relies "in significant part on the recommendations and conclusions of the JSGC Report, which were entirely unknown to him before the report was issued on June 25, 2018," and not the underlying statistical data. Appellant's Brief at 16. Because we determine those conclusions do not constitute newly-discovered facts within the meaning of Section 9545(b)(1)(ii), it is unnecessary to determine if Appellant acted diligently in discovering the JSGC Report.

Furthermore, because Appellant cannot successfully invoke Section 9545(b)(1)(ii) to excuse the untimeliness of his PCRA petition, we cannot address Appellant's second issue or the PCRA court's alternative analysis of the underlying constitutional claim(s). *See Commonwealth v. Abu-Jamal*,

833 A.2d 719, 723–24 (Pa. 2003) ("The PCRA's timeliness requirements are jurisdictional in nature and a court may not address the merits of the issues raised if the PCRA petition was not timely filed.").

Order ***affirmed***.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2021